# National Tube Works Company, Plff. in Err., *v.* Baltimore & Ohio Railroad Company.

In an action to recover alleged overcharges for the transportation of freight by defendant, a railroad company, *held*, that the act of 1846 does not reduce the toll and freight rate which the defendant, by the 14th section of the act of 1837, is authorized to charge for the transportation of goods over the Pittsburgh & Connellsville Railroad, operated by it.

*Held*, also, that railroad corporations may make charges for extra or special services that do not properly pertain to transportation, rendered in and about the transportation of freight.

*Held*, also, that if the rate allowed by law for a railroad company to charge for the transportation of freight is exceeded by it, it commits a wrongful and illegal act and must be presumed to have committed it knowingly; and if goods transported by it are withheld from the owner until the charges shall be paid, illegal charges paid under a mistake of fact as to the distance of carriage may be recovered.

(Argued November 16, 1886. Decided January 3, 1887.)

October Term 1886, No. 160, before GORDON, PAXSON, TRUNKEY, STERRETT, GREEN, and CLARK, JJ. Error to the Common Pleas No. 1 of Allegheny County to review a judgment for defendant entered upon a report of a referee in an action to recover alleged overcharges for the transportation of freight. Affirmed.

The case was submitted to R. B. CARNAHAN, Esq., as referee, who filed the following report:

This is an action of assumpsit, brought to recover alleged overcharges of freight.

The plaintiff company was incorporated some years ago under the laws of the state of Massachusetts and has its principal office in Boston, but its works, which are very extensive, covering

---

NOTE.—Illegal charges may be recovered in an action for money had and received. Paine v. Pennsylvania R. Co. 14 Pa. Co. Ct. 38, 7 Kulp, 187. But if the sum is paid without objection, with knowledge of the facts, no recovery can be had. Thomas v. Philadelphia & R. R. Co. 1 W. N. C. 621. This is not true where the payment was made to prevent the loss of perishable goods. Root v. Oil Creek & A. River R. Co. 2 Legal Chronicle, 145.

For authorities as to power of legislature to fix rates, see editorial note to Winchester & L. Turnp. Road Co. v. Croxton, 33 L. R. A. 177.

over twenty acres of ground, are located in McKeesport, Allegheny county, Pennsylvania. The defendant, the Baltimore & Ohio Railroad Company, is the lessee of the Pittsburgh & Connellsville Railroad Company and has been operating that road during the whole period of time covered by this suit and still is operating it.

Until shortly after the time of bringing this suit the Pittsburgh & Connellsville was the only railroad company which passed through McKeesport. About the first of January, 1875, the National Tube Works Company began to ship and receive shipments of freight on the Pittsburgh & Connellsville Railroad between McKeesport and Brinton station, on the Pennsylvania Railroad. The main tracks of the Pittsburgh & Connellsville Road follow the Monongahela river from Pittsburgh to the Youghiogheny river, but there is a branch line which connects this road with the Pennsylvania Railroad, extending from Port Perry on the former to Brinton station on the latter, and known by the name of "the Brinton curve."

The manufactory and works of the plaintiff in McKeesport are not on the line of the Pittsburgh & Connellsville Railroad, but a branch or switch called "the Locust street switch" is connected with the main line near the corner of Fifth and Locust streets in McKeesport, the switch being continued down Locust street, at right angles with the railroad, to near the bank of the Monongahela river, a distance of from 2,000 to 2,500 feet. On this switch or siding, at a distance of 530 feet from the frog on the main line of the railroad, is another switch, over which cars are run into the yards of the National Tube Works. Further down "the Locust street switch" are the iron mills of W. D. Wood & Company, and also a glass works, both of which manufactories have switch connections with the Locust street track. This track leaves the main line at a sharp curve on or near the east line of Locust street, and passes down a rather steep grade to Fourth street, thence by a comparatively easy grade to W. D. Wood & Company's iron works.

The National Tube Works Company, from the first of January, 1875, to the last day of July, 1882, shipped and received shipments of freight over the Pittsburgh & Connellsville Railroad, operated, as before stated, by the Baltimore & Ohio Railroad Company, to and from Brinton station, on the Pennsylvania Railroad, and their yards and works at McKeesport, to

the amount of 404,968,961 pounds, that is to say, a fraction over 202,484 tons, for which the plaintiff was charged 50 cents per ton, amounting to $101,242.17. The distance from Brinton station to the tube works in McKeesport was believed by the plaintiff corporation to be about 5 miles, or rather something over 5 miles, and the defendant seems to have so thought, too, or, at least, not to have known the exact distance.

In the latter part of December, 1881, the plaintiff corporation, after having caused an examination to be made by counsel of the rates authorized by the charter of the Pittsburgh & Connellsville Railroad Company to be charged for freight, claimed that 50 cents per ton for 5 miles transportation of freight was beyond the rate authorized by the charter—that the rate should have been 40 cents per ton for 5 miles, assuming the distance to be 5 miles between Brinton and McKeesport; and all the payments of freight made by the plaintiff company in the year 1882, that is to say, from January to July inclusive, were made under protest that the rate was illegal, to the extent of 2 cents per mile, and claiming and reserving the right to recover the excess over the alleged legal rate by action at law.

For the seven preceding years, from the first of January, 1875, to the first of January, 1882, the freights charged by the defendant were paid on bills rendered every two weeks, without question as to the rates. The plaintiff, also, about the first of January, 1882, was led to believe that the distance between its works and Brinton station, on the Pennsylvania Railroad, is less than five miles, and as the rates of freight which the charter of the Pittsburgh & Connellsville Railroad Company permits the corporation to charge for transportation of freight are rates per mile, the plaintiff claims that it ought to recover the difference between the full mile rate and the proportion of that rate where the distance is less than a mile.

Surveys of the distance have been made by engineers, employed both by the plaintiff and the defendant, and the testimony of these engineers was taken by the referee and found to be in substantial accord. From the McKeesport station, near the frog of the Locust street switch, to Brinton station, on the Pennsylvania Railroad, the distance is found to be 4 8-10 miles. The engineer of the plaintiff measured from McKeesport station to Port Perry, on a line in the center of the space between the double tracks on the main line of the Pittsburgh & Connellsville

Railroad. The engineer for the defendant measured along the center of the east bound track from Port Perry to McKeesport, and they all measured on the center line of the Brinton curve, from Port Perry to Brinton. The result is as above stated.

The engineer for the plaintiff made no other measurement at McKeesport: but the engineer for the defendant measured the Locust street track from its connecting frog with the main line to the frog which connects the Tube Works track with that on Locust street, and found the distance to be 530 feet—that is, to say, 2 feet more than the tenth of a mile. He also measured the distance from the McKeesport station, near Locust street, to the eastern line of the corporation of McKeesport, and found the distance to be one mile, making a total of 5 8-10 miles from the eastern limit of McKeesport to Brinton, on the Pennsylvania Railroad, measured on the tracks of the railroad. As matter of fact, the referee finds, from the testimony, that the distances are as above stated, and also that the actual distance from the frog on the Locust street track, below Fourth street, where the Tube Works tracks make connection with the Locust street track, to Brinton station, is 4 9-10 miles; also, that none of the freight transported by the defendant was actually hauled a shorter distance than 4 9-10 miles but that much of it was hauled a greater distance, especially the outgoing freight, consisting principally of manufactures of the plaintiff company.

It is established by the testimony that the loaded cars of the plaintiff were hauled from points at considerable distances below the Tube Works frog on the Locust street branch, above referred to. (See particularly the testimony of Charles Donnelly, formerly vice president of the defendant company, who says: "I think the Tube Works had an engine of their own, and we delivered to a certain point where there was a frog, and further down on Locust street where they loaded their pipe—not quite as far as Wood & Company's").

Wood & Company's mill is between 1,500 and 2,000 feet from the main line of the Pittsburgh & Connellsville Railroad. Mr. Donnelly says this loading was not quite down that far. He does not give the exact distance down, but if the distance was half way between the frog and Wood & Company's it would be about the tenth of a mile below the frog; and the referee is of opinion from the evidence that while the greater part of the incoming freight was not actually hauled a greater distance

than 4 9-10 miles, the outgoing freight, or the greater part of it, was hauled five miles, without making any allowance for distance traveled in shifting and bringing cars together to make up trains.

The first question which arises on this record is, What is the rate of freight which the Pittsburgh & Connellsville Railroad Company may lawfully charge for the transportation of merchandise and commodities?

The company was incorporated by an act of assembly of the state of Pennsylvania, passed April 3, 1837. Pamphlet Laws 1836–7, p. 185.

The 13th section of the act is as follows:

"On the completion of the said railroad, or any portion thereof not less than ten miles, the same shall be esteemed a public highway for the conveyance of passengers and the transportation of merchandise and commodities, under such regulations as shall be prescribed by the directors; and it shall and may be lawful for the said company to demand and receive such sum or sums of money for tolls of persons and property as they shall think, from time to time, reasonable; *Provided,* The toll on any species of property shall not exceed 5 cents per ton per mile, nor upon passengers not more than 3 cents each per mile; and it shall be further lawful for the president and directors of said company to prescribe the kind of carriages, wagons, and conveyances which shall be used on said railroad for the transportation of persons and commodities, and to adopt such regulations as to the transit of wagons and carriages on the said road as may seem to them most conducive to the interests of the public and of persons using the same; and the legislature reserves the right to reduce and regulate the tolls."

The original and, to some extent, continuing idea of a Pennsylvania railroad, is well illustrated by this charter, and particularly by the preceding section. The railroad is a public highway, and may be used by any person who chooses to engage in the business of transportation of passengers and freight. The company may prescribe the "kind of carriages, wagons, and conveyances for the transportation of persons and commodities," and regulate "the transit of wagons and carriages on the said road" in the interest of the public and the persons using the same. The railroad company had a right to charge tolls on property and persons conveyed at a rate per mile. The word

"locomotive" is not found in the act but the term "machines" found in the next section, indicates that our legislature had some knowledge of the new method of traction, then beginning to be used in England.

As late as 1829–30 it was still an open question among scientific engineers in England whether traction by means of stationary engines drawing cars by ropes or chains, or by a movable engine, was the better method. Mr. Stephenson had made an engine which drew 90 tons of freight at the rate of 4 miles per hour some years previously, and on the Darlington road in England light freights had been transported at the rate of 9 miles an hour by a movable steam engine, but for the more rapid transportation of passengers in small cars horses were used, by which method of traction a speed of 10 miles an hour was attained. The "Rocket" engine, the original of the modern locomotive, invented and constructed by Mr. Stephenson and his equally distinguished son, was placed on the Manchester and Liverpool Railway at its opening, in September, 1830. To the astonishment of the scientific world it conveyed 17 tons of freight, in different cars, and on the most favorable portions of that road, 14 miles per hour, while a speed of 17 miles per hour was attained in the transportation of passengers. This locomotive weighed 4 tons and 5 cwt.

The 13th section of this charter seems to have exclusive reference to transportation by persons or companies other than the railroad company. As any man could place his stage coach or wagon on the turnpike road, or his boat on the commonwealth canal, and transport passengers and goods, using his own horses for the purpose, and paying only such tolls for the use of the highway as the law authorized, so could he in like manner place his passenger coach or freight car, and perhaps his "machine," too, on this railroad for like purpose, subject only to the regulations of the railroad corporation as to "the kind of carriages, wagons, and conveyances" to be used, and the payment of the toll authorized by the charter of the company. But the charter also contemplates that the railway company itself may engage in the business of transporting freight and passengers on the public highway which it was about to construct, and the 14th section of the same act, accordingly, provides that "the president and directors shall have full power to purchase, with the funds of the said company, and place on the said railroad, all

machines, vehicles, carriages, and teams of any kind whatsoever which they may deem proper and necessary for the purposes of transportation; and that they may also, to any extent which they may deem advisable, transport all goods, wares, minerals, and merchandise, or other articles that may be offered them for transportation, and all passengers wishing to be conveyed on their railroad; and the said president and directors may charge for toll and freight on all articles and for passengers so conveyed by them, their officers, and agents, not exceeding twice the rates granted in the preceding section of this act for tolls alone."

As the preceding section authorized a toll on any species of property not to exceed 5 cents per ton per mile for the mere use of the highway by persons, companies, or corporations other than the railroad corporation, and the 14th section authorizes the railroad company, when engaged in the business of transportation itself, to "charge for toll and freight on all articles" a sum "not exceeding twice the rates granted in the preceding section for tolls alone," it is manifest that the rate which the railroad company was authorized to charge by the 14th section is ten cents per ton per mile. Of this there can be no doubt. But it will be observed that there is a legislative reservation in the 13th section, of "the right to reduce and regulate the tolls;" and it is contended by the plaintiff that this right was exercised by the legislature in the passage of the 9th section of the act of the 10th of April, 1846 (P. L. 287). The section provides. "that the rates of toll authorized to be charged by the 13th section of an act to incorporate the Pittsburgh & Connellsville Railroad company, approved April 3, 1837, shall not exceed $2\frac{1}{2}$ cents per mile for each passenger; 4 cents per mile for each ton of 2,000 pounds for freight; 3 cents per mile for each passenger car, and 2 cents per mile for each burden or freight car, every four wheels being computed as a car."

This section also repeals the proviso to the 13th section of the act of April 3, 1837. It is not entirely clear that this act was intended to reduce the tolls which might be charged on the Pittsburgh & Connellsville Railroad. There is nothing in the act itself from which such intention can be inferred; but the undoubted effect of the act since the great enlargement of freight cars, the use of steel rails and the greatly increased capacity of locomotive engines, is to operate such a reduction. The act of

1837 fixed the toll at 5 cents per ton per mile. Under the act of 1846 the rate is 4 cents per ton per mile, with the addition of two cents per mile for each burden or freight car; so that to transport a single ton in a car one mile would cost 5 cents, under the act of 1837, while the toll would be six cents under the act of 1846. Should the car contain 2 tons to be transported one mile, the rate would be precisely the same under the two acts, supposing the car to have only four wheels; but if the freight car rested on eight wheels, each four wheels being computed as a car, 3 tons transported a mile would be charged 15 cents under the original act and 16 cents under the act of 1846. Should such a car carry 4 tons one mile on the railroad, the toll would be 20 cents under the former act, and exactly the same under the act of 1846. But if the car carried 12 tons, as many do now, say a distance of 5 miles, the toll chargeable would be $3 under the former act, while under the latter act it would only be $2.60; that is to say, $2.40 for tonnage at 4 cents per ton, and 20 cents for wheelage at 2 cents per mile for 4 wheels. When it is considered that the goods wagon in England, which is the same thing as our freight car, on their great thoroughfares, as late as 1854, had an average capacity of only 5 tons, as shown by railroad statistics, there will appear to be ground for doubt whether the act of 1846 was intended to reduce the tolls.

As the act of 1837 has respect only to tonnage, a load of considerable bulk but of light weight would pay but little in the way of toll. A carload of oats would be charged about half as much as a carload of wheat, supposing the cars to have the same bulk capacity; while a carload of coal would pay a much larger toll than one of wheat, and a carload of coke would not pay half the toll chargeable on a similar bulk of bituminous coal. It seems to the referee more probable that the toll, in respect to the cart or vehicle or cart itself without any reference to tonnage, was intended, in some measure, to obviate these inequalities and that the whole section was intended to have this effect rather than to reduce the tolls.

No part of the Pittsburgh & Connellsville Railroad had been built at the time when the act of 1846 was passed, but a good deal of enterprise in the direction of railroad building was being developed at that time. The act incorporating the Pennsylvania Railroad Company was passed by the Pennsylvania legislature in the same year (1846), and at the same session some

very distinguished citizens of Pittsburgh were added to the number of commissioners named in the act to incorporate the Pittsburgh & Connellsville Railroad Company. See act of 17th of April, 1846, § 8 (P. L. 370).

It is not probable that the legislature intended, by the section of the act of 1846 referred to, to reduce the profits of railroad companies, the legislative tendency at that time being to encourage railroad construction; and it is not probable that freight cars carrying more than 4 tons were contemplated as likely to be run on the Pittsburgh & Connellsville Railroad, or any other railroad, indeed, in Pennsylvania. But it is contended by the plaintiff, in effect, that the amount which the Pittsburgh & Connellsville Railroad Company may charge for toll and freight depends in part on the toll which it might charge the private transporter, and that the toll rate being reduced by the act of 1846, the company's toll and freight rate undergoes a corresponding reduction; because the company's rate is to be twice the rate granted for tolls. There are cases in which the supplement to an act is to be carried back and read in the act which is amended by it, as if incorporated therein. This happens very often in the application of public laws, but it does not appear to the referee that this belongs to that class of cases.

Indeed, the act of 1846 is not, in form, an amendatory act. It is a substitute for the proviso to the 13th section, which it repeals. The railroad company is authorized to charge for toll and freight on all articles conveyed by it, not exceeding twice the rates granted in the "preceding section" of this act, for tolls alone that is to say not double the tolls which might be authorized by subsequent legislation, but twice the rates granted in the preceding section of this act, to wit: the 13th section of the act of April 3, 1837. It is true that the legislature seemed to regard the machines, cars, passengers, and freight which the company might put on the railroad, and the expenses of conveying passengers, as entitling the company to a remuneration about equal to that derived from tolls; and hence the toll and freight rate of the company was intended to be double the toll rate first fixed in the 13th section of the act; but there is no indication of any purpose on the part of the legislature to make the toll and freight rate of the company depend on the toll rate of the private transporter.

While there is a reservation of power to regulate and re-

duce the toll rate in the 13th section, there is no such reservation as respects the toll and freight rate in the 14th section; and it is not to be presumed that the legislature intended to reserve any power to reduce the toll and freight rate mentioned in the 14th section, for by the exercise of such a power the rate might be reduced to a mere nominal figure, and if the freight rate of the company depended on the toll rate, the company would have been at the mercy of the legislature, which might, by a reduction of the toll rate, make it impossible for the company to operate with profit the railroad which it had built. Certainly no capitalists would have invested money in a railroad enterprise with a power in the legislature to so reduce the toll and freight rates as to make the franchises valueless. This is not the spirit of the railroad legislation of 1846, and it is not the spirit of this charter. As before shown, it is not probable that the legislature intended to reduce the toll rate by the act of 1846; and it is only because a 60 ton locomotive has supplanted one weighing 5 or 6 tons, because a car carrying 20 tons has taken the place of one which, perhaps, carried not more than 2 or 3 tons, because iron rails have given place to steel rails, and great improvements have been made in the construction of railroads and railroad bridges, greatly enlarging the capacity of the road to bear heavy burdens, that the act of 1846 has, in the year 1884, the effect or result of reducing these toll rates.

The referee is accordingly of opinion that the act of 1846 does not reduce the toll and freight rate which the company is authorized to charge for the transportation of goods on its railroad, by the 14th section of the act of 1837, and that the maximum rate is 10 cents per ton per mile, while the toll rate which the company may charge the private transporter for the mere use of the highway is 4 cents per ton per mile as a tonnage toll and 2 cents per mile as a wheelage toll, computing four wheels as a car. In fact, as it seems to the referee, the section of the act of 1846 referred to is practically obsolete, for the private transporter has long since disappeared from the Pittsburgh & Connellsville Railroad, if he was ever on it, and the whole business, passenger carriage and freight transportation, is now conducted by the railway company itself. Nor can these provisions of the charter, enacted when railroad construction and operation were in their infancy, be clearly understood, much less be construed and applied, at this day, when the entire business of

passenger carriage and transportation of goods on land is conducted by railroads, which appear to be approaching the maturity of development, without referring to the state of the art of railroad building and operation at the time when this early legislation was enacted.

But while the maximum charge for transportation of freight by the Pittsburgh & Connellsville Railroad Company, authorized by law, is, if the referee be not in error, 10 cents per ton per mile, there is no reason in law why the company may not adjust the freight rate within that limit, to the amount and character of the service performed for the shipper or consignee. The service performed for some may be attended with great expense and trouble, dependent on the kind of goods carried, the care and attention required, the difficulty of loading, unloading reaching the place of delivery, etc., etc. Distance alone may be a large element in the actual rate, and if it be short, and the service troublesome and expensive, a proportionably high charge may be expected, and is equitable. All railroad companies make these adjustments of freight rates to the character of the service performed. All have general and special rates. Uniform charges per ton per mile are not adapted to the railway transportation of this day, for the merchandise carried is as varied as the articles of commerce. But the maximum rate for transportation, authorized by the charter, must not be exceeded, and the public interest imperatively requires that railroad corporations should be rigidly held to the duties and obligations of common carriers, when they act as such, as is perhaps universally the case at this time.

The evidence in this case, however, shows that railroad corporations do, or may, make charges for matters that do not properly pertain to transportation. A shipper or consignee neglecting or refusing to receive his goods at the destination of the shipment, within a reasonable period, may be charged for storage if the goods be put in a warehouse, or demurrage when the goods remain in the car in the company's yards for an unreasonable time, thus depriving the company of the use of its own car. There is a "switching service," often indispensable to the shipper or consignee, but quite different from transportation proper and not included in it. Where cars are delivered by one railroad company to another and placed on the tracks of the latter road, a charge is made for that service. Mr. Charles A.

Chipley, division freight agent of the Pennsylvania Railroad, called by the plaintiff, says: "Where it is switched from another line there is a nominal charge of $1.50, $2.00, and sometimes as high as $3.00 per car; for instance, the Pennsylvania Railroad Company brings freight into Pittsburgh to go to a point on the Allegheny Valley Railroad. The Valley Road makes a charge for switching that car. We are glad, indeed, to absorb that switching charge and pay it ourselves." But the testimony in this case shows that the switching and making up of freight trains of the National Tube Works freight at Brinton was performed by the Baltimore & Ohio Railroad Company, the defendant.

Mr. Charles Donnelly, late vice president of the defendant company, but not now connected with that corporation (called for the defendant), testified: "The Pennsylvania road has a shifter at Brinton, but we make up all the trains. They don't come on our tracks, except just to haul the trains off. The Baltimore & Ohio delivered three or four or five trains to them a day, and they about one or two to us. While I was with the road it had Jack Sturgeon as a yard master at McKeesport at one time.. I believe the Tube Works took him afterwards. We make up all the trains at Brinton for both the Baltimore & Ohio and the Pennsylvania Railroad. The Pennsylvania Railroad requires that."

This would be the subject of a legitimate charge on the part of the Baltimore & Ohio Railroad, for it is a service rendered after the transportation to Brinton had ended, as respects freight of the plaintiff delivered at Brinton, and before the transportation began as respects freight of the plaintiff hauled to McKeesport. There is some conflict in the testimony as to what is and is not a shifting service, in the sense of entitling the carrying company to an extra or additional charge. But all the witnesses are agreed that the rate paid for transportation covers and includes the shifting service where the manufacturer or consignee has a yard near the main line, with tracks connecting with the railroad, and the cars can be run into the yard by the road engine which has hauled the freight. It is a convenience to the consignee to have the freight cars moved from the main track to his own yard, and the railroad company is relieved of the trouble and expense of loading and unloading cars. The advantage is therefore mutual. But in this case the facts are en-

tirely different, and, as detailed by numerous witnesses, are substantially as follows:

Neither the loaded nor empty cars hauling the National Tube Company's freight could be taken from the main line of the railroad nor brought to it by the road locomotives. The curve on the Locust street track at McKeesport was necessarily so sharp that the ordinary road engine would not run over it; hence shifting engines were required to bring the freight from the Tube Company works to the railroad station, and to haul from the railroad to the plaintiff's works. When the Baltimore & Ohio Railroad began to transport freight for the plaintiff, only one shifting engine was required on the Locust street track to haul out and make deliveries of freight. Another shifting engine became necessary and was placed on this track by defendant, and finally a third.

About two thirds of the deliveries of freight and of the cars hauled out on the Locust street switch or track were for the National Tube Works, but switching was also done for W. D. Wood & Company, 1,500 feet further down the track, and also for the glass works, amounting to the other third of the whole business. These switching engines were more or less used daily in the yards of the National Tube Works in shifting, moving and making up trains. There is considerable conflict in the testimony as to the extent of this use, defendant's witnesses testifying that it was almost constant in the day time and up to late hours of the night, while the plaintiff's witnesses testify that while these engines were used for the benefit of the plaintiff on some days for four or five hours, or a longer period of time, on other days they were not so engaged at all, and that the daily use would not average more than one or two hours. In the view which the referee has taken of the case it is not necessary for him to determine from the testimony the precise extent and value of the service rendered by the defendant to the plaintiff. Doubtless it fluctuated and was greater and less on different days and at different periods. It is sufficient for the purpose of the case that the plaintiffs admit that a service of this kind was rendered by the defendant so frequently as to make it an average daily service, and that the testimony clearly establishes that this service was not only troublesome but very expensive, involving the use of the shifting engines and the cost of running them, made up of fuel, crews of men, etc.

The defendant has offered also much testimony tending to show that owing to the inability of the plaintiff company to receive its freight when it arrived, in consequence of the limited capacity of its yards, the railway siding at McKeesport was frequently occupied by the freight cars of the plaintiff for periods from a week to thirty days, and in some instances for sixty days; that a siding 2 miles above the McKeesport station was similarly blocked from time to time, and that occasions arose on which the freight of the Tube Works Company had to be hauled from 6 to 12 miles above McKeesport to find storing room, while the yards and side tracks of defendant company's road were ample for the receiving and delivery of freight; that while the Railroad Company's yards and sidings were so blocked, daily demands were made by the plaintiff for the delivery of particular cars loaded with material specially needed on the particular day and hour for the purposes of the plaintiff's manufactory; that if the car required should happen to be at the end of a train standing in the yards or on the side tracks of the railroad, it could be got out and switched into the Tube Company's yard without special difficulty, but that this rarely happened, and that it was generally necessary to shift and move many cars, and sometimes nearly all of·them, when the required car was found in the middle of the train, to get it out for delivery, involving great trouble, delay, and expense, and sometimes requiring an hour and a half of time to make the delivery of the car possible, and that the trouble and expense of delivery was also greatly increased by the plaintiff's requirement of only one or two cars at a time, etc.

The plaintiff introduced evidence in rebuttal tending to show that the alleged blockade of defendant's road, yards, and sidings was exceptional, and was in fact caused by the greatly increased transportation of coke in 1880 and 1881, popularly termed the "coke blockade;" that if defendant's yards and sidings were obstructed at other times by the plaintiff's freight, it was on account of the limited capacity of the defendant company's yards and sidings, which were insufficient for the business of the road; that in point of fact the plaintiff had ample yard room, having in 1880 and 1881, 4 miles of tracks in its yards, which was sufficient for all the business of the plaintiff company, and that a mile of track has since been added.

The weight of testimony appears to be that the blocking in

1881 was, in large part, the result of the pressure of the coke business, but that the [plaintiff's cars did occupy yards and sidings of the railroad company for unreasonable periods during several years, and might, fairly enough, have been subjected to charges for demurrage,] a charge which the evidence shows amounts to from $2 to $5 per day, but is, in point of fact, rarely exacted from regular customers. All the evidence (and it is quite voluminous) relating to the blocking of the tracks, the necessity of shifting engines on the Locust street track and the service performed by them and their crews, as well as the service performed at the Brinton end of the "Brinton curve," was admitted by the referee, under objection as to its competency and relevancy, but the referee admitted the evidence for the purpose of showing the nature and character of the railroad service performed by the defendant in carrying freight to and from Brinton and McKeesport, and of ascertaining whether that service was a service of transportation merely, or whether it embraced legitimate subjects of charge and expense, in addition to the toll and freight rate.

If the evidence has been properly admitted, the referee is of opinion that the testimony in the case clearly shows that a large and very expensive service, entirely outside of the toll and freight rate for transportation, was rendered by the defendant company for the plaintiff company at the McKeesport station on the Locust street track, and in the yards of the plaintiff's works; a service which the evidence shows cost the defendant company several thousand dollars a year; and that an extra service was also performed by the defendant company at Brinton station on the Pennsylvania Railroad, which, according to the testimony, especially that of Charles A. Chipley, as to the value of it and ordinary rate of charge, would amount to several thousand dollars a year; that is to say, the making up of trains for the Pennsylvania Railroad Company to be sent east or west from Brinton station. Indeed, there is evidence in the case tending strongly to show that the rate of 50 cents per ton from the Tube Works to Brinton station was an agreed rate between the plaintiff and defendant. Mr. Charles A. Chipley testifies that Mr. Flagler and Mr. Converse, of the Tube Works Company, came here about 1869 or 1870 from Boston, and were looking around for a place to locate their works; that they were thinking of selecting a piece of ground on the Ft. Wayne & Chi-

cago Railroad for that purpose; that Mr. A. H. McLeod, Assistant General Freight Agent of the Baltimore & Ohio Railroad, and Mr. Garrett "took Mr. Flagler about;" that part of this he knew personally and partly from becoming freight agent of the Baltimore & Ohio Railroad afterwards at Pittsburgh, in which place he became familiar with the contracts for shipping which he carried into effect. He says:

"It was understood, time after time, between the B. & O. and the National Tube Works, that in all the business to and from their works at McKeesport, as far as the B. & O. was concerned, that they should have the same rates, or the current rates, from their works, as were current from Pittsburgh." He further testifies: "In all the rates that I made when I was with the B. & O., and I think I am pretty correct in stating that they are the basis probably of all the rates that have been subsequently made, were based on the rates that I made when the concern first moved there. The rates were made absolutely without regard whatever to switching. The most money we charged from McKeesport to Brinton, if my memory serves right, was 50 cents per ton. I think the records of the B. & O., if you go back, will show you that these were the special rates that were charged on that business and the business of W. D. Wood & Company." He further says: "We generally made those rates without regard to mileage—generally made those rates with reference to the cost of the service and enough to give us a fair profit. . . . As a matter of course, the rate per ton per mile is much greater than on larger hauls."

The testimony of this witness is corroborated by the freight bills and statements of freight paid by the plaintiff company and which the plantiff has offered in evidence. For seven years, from the first of January, 1875, to the first of January, 1882, the plaintiff company paid the defendant company 50 cents per ton for all the freight carried to and from McKeesport and Brinton, without objection of any kind, and it was only after some ex-officer of the defendant company told Mr. Holdane, in the last days of December, 1881, that the defendant company had no legal right to charge more than 4 cents per ton per mile, and that the distance was short of 5 miles, that the plaintiff began to protest. [There is, indeed, no direct and positive evidence of an agreed rate, although the evidence strongly points to one inferentially, but the referee is of opinion, and so finds,

that the rate established by the defendant company for carrying the plaintiff's freight to and from the points so often mentioned, and during the time, from January, 1875, was 50 cents per ton, and that this rate included the service referred to at Brinton, the switching at the Locust street track in McKeesport, the use of defendant's shifting engines by the plaintiff, and the entire expense attendant upon the transportation of plaintiff's freight.] He is of opinion, too, that the rate was a reasonable, and that while about one half of the freight was carried 5 miles and the other half only 4 9/10 miles, the actual services rendered by the defendant to the plaintiff, apart from mere transportation, if charged at the most reasonable rates, would be greatly in excess of the full 5 miles carriage at 50 cents per ton. [Even if the rate for toll and freight had been fixed at 4 cents per mile for tonnage and 2 cents per mile for wheelage, computing every four wheels as a car, a reasonable allowance for the extra services rendered by the defendant company, in and about the transportation of the freight, would be greater than the difference between that rate and the rate actually charged. The referee must therefore find that the plaintiff, in any view of the case, has no cause for action.]

Other questions were raised on the evidence and discussed with much ability before the referee. The company claimed that the transportation service rendered by the defendant for the plaintiff belongs to the class of carriage embraced under the head of interstate commerce, and that it was not within the competency of the legislature of Pennsylvania to establish binding rates of transportation on freight shipped for carriage beyond the limits of the state. It appears from the evidence, that about three fifths of the freight carried by the defendant for the plaintiff either came from beyond the limits of the state, or was to be carried out of the state. But in the view which the referee has taken of the testimony the question of interstate commerce does not, in his opinion, arise in this case. The rate paid was a special rate and the service rendered was, to a large extent, special in its nature; and the toll and freight rate paid, including the special services, apart from mere transportation, was not paid as a part of the through rate.

Another question related to the right of the plaintiff to recover back money paid for tolls and freight in excess of the legal rate, unaccompanied by a protest against the illegal charge.

If the referee be not wholly in error in the views heretofore expressed, the question is merely hypothetical as respects the case, and the referee does not feel that he is required to go into an examination of it at length.

The plaintiff's third point is as follows: "That, as regards the payments made by the plaintiff between McKeesport and Brinton for freight, the excess over the legal rate, amounting to $20,248.45, was paid under a mistake of fact, and plaintiff is entitled to recover that amount." This point assumes that the legal rate which the defendant might charge is 4 cents per mile per ton. The referee has found that the defendant might lawfully charge for transportation alone 10 cents per ton per mile; but if the referee should be in error in that finding, the authorized rate is more than 4 cents per ton per mile. The act of 1846 authorizes, as before shown, a toll, in respect to the car carrying the freight, of 2 cents per mile, four wheels being computed as a car. Now the evidence shows that the cars were of various sizes and capacities, ranging between 8 and 12 tons, and all of them eight-wheeled cars, and consequently the charge for wheelage must be 4 cents a mile. Assuming that the cars had an average capacity of 10 tons, 20,248 cars were used in this transportation; and as each car was conveyed nearly 5 miles, the wheelage toll on each car was nearly 20 cents, making the sum of about $4,040, which being doubled makes $8,080 as part of the toll and freight rate. This must be deducted from the sum of $20,248.45, which the plaintiff seeks to recover, as the difference between the 10 cents per ton per mile rate and the alleged 4 cents per ton per mile rate, leaving $12,168.45.

The referee is of opinion, founded on the testimony of Thomas M. King as to the monthly rental of shifting engines of the kind used on the Locust street track, and of other witnesses as to the expense of the service, apart from the transportation rate rendered by the defendant to the plaintiff, both at McKeesport and Brinton, that $2,500 per annum is a very low compensation for these services, and that, in fact, the actual cost of the services was much more, and he accordingly so finds. And admitting, for the sake of the argument, that the legal rate for tolls is 4 cents per ton per mile, with the wheelage rate of 2 cents per car per mile for four wheels, and that the toll and freight rate is double that amount [the legitimate charges for the services above mentioned, and which the defendant calls "terminal

facilities," would much more than make up for the difference between the 10 cents per mile rate and the rate last above mentioned, including the alleged overcharge for the shortage in distance, and the plaintiff has no reason to complain, and no ground for recovery even in that view of the case.]

As respects the abstract proposition embodied in this point, whether money paid under a mistake of fact can be recovered, the general rule is that where the fact is equally open to the knowledge of the parties, there can be no recovery; but if there be false representation, or dishonest suppressions or concealment of a fact, and if, in the case of a transporter, goods are withheld from the customer until the charges are paid, it would be otherwise, even if the fact related to the distance of carriage, the rates being per ton per mile. If the parties are under mutual misapprehension as to the distance, the road is open to measurement by either, and the excess cannot be recovered unless the disparity between the actual distance and the distance charged be so great as to raise a presumption of fraudulent misstatement, or show failure of consideration. But it is otherwise in the case of illegal charges as such. The railroad company is bound, I think, to know its own charter, while a shipper or consignee may not have that knowledge, nor be able to obtain it without trouble. If the rate be per ton per mile, and there be no mistake of fact as to the distance between the termini of the shipment, and the rate is exceeded by the railroad company, it commits a wrongful and illegal act, and must be presumed to have committed it knowingly if called to account for it.

For these reasons plaintiff's third and fourth points are refused on their application to this case, although both embody a principle which would require an affirmance if presented in abstract form.

All the foregoing statements of fact, founded on the evidence and not herein before specially found, the referee now finds to be proved by the testimony; and, for the reasons above stated, he finds that the plaintiff has no cause of action and that judgment must be entered for the defendant for costs.

Defendant, *inter alia,* presented the following points:

1. That the charter of the Pittsburgh & Connellsville Railroad Company, the lessor of the defendant company, authorizes

the defendant to fix the rate for toll and freight on the shipments in questions in this suit at the sum of 10 cents per ton per mile, and the proportionate part of such sum for any fractional part of a mile.

*Ans.* Affirmed.

4. That the rates for toll and freight fixed by the charter of the Pittsburgh & Connellsville Railroad Company cover the price for transportation only; and that the terminal facilities furnished the plaintiff by the defendant at McKeesport and Brinton, as described in the evidence, is not comprehended in the rates so prescribed; that the defendant is entitled to a just and reasonable reward for such facilities, in addition to the transportation price prescribed by the charter; and the plaintiff cannot recover unless the referee may find that the excess over the charter rate actually charged upon the shipments in question was an unreasonable compensation for the terminal facilities so furnished the plaintiff.

*Ans.* This point is affirmed, with the explanation that "terminal facilities" means the services described in the testimony of preparing the freight for transportation and receiving it at McKeesport, use of the shifting, services of the crew, etc., and the making up of trains for the Pennsylvania Railroad at Brinton and receiving cars from the Pennsylvania Railroad at Brinton for transportation to McKeesport.

The assignments of error specified the portions of the report inclosed in brackets, the answers to defendant's points above set out and the action of the referee in charging plaintiff with demurrage and shifting service.

*W. A. Dunshee* and *W. B. Rodgers,* for plaintiff in error.— In Chicago & N. W. R. Co. v. Jenkins, 103 Ill. 599, it was held that the right to demurrage does not attach to carriers by railroads, because such carriers, if a consignee fails to remove his goods, may store them in their warehouse and thus terminate their liability as common carriers, and assume the relation of warehousemen.

In Burlington & M. R. R. Co. v. Chicago Lumber Co. 15 Neb. 393, 19 N. W. 451, it is held that a railroad company is not entitled to charge demurrage for freight standing in its cars unless by virtue of contract or statute.

Lancashire & Y. R. Co. v. Gidlow, 32 L. T. N. S. 573, was a

case where at some railway stations a colliery owner had been allowed to leave his cars on the ground adjoining the lines. Held, that this might have been the subject of an agreement for payment for an advantage thus obtained by him, but did not come within the description of a service.

In Belfast Cent. R. Co. v. Great Northern R. Co. 4 Nev. & Macn. 159, it is held that delay in unloading wagons at a particular station is not a cost which ought to make the through rate higher.

In Nestor Colliery Co. v. London, etc. R. 4 Nev. & Macn. 257, it is held that the freight rate includes working a junction and marshaling the cars into trains.

In Lancashire & Y. R. Co. v. Gidlow, 42 L. J. Exch. N. S. 129, an act of Parliament, while providing the maximum rates of tolls to be charged, made an exception in respect of special services to be rendered by the company for loading, unloading, collection, and delivery of goods. Held, that the company was not entitled to charge for special services (which seems to have been for coming to a switch for cars) although found by a jury to have been actually rendered; the customer charged for such services not having had the offer and option first distinctly given him of either availing himself of services at the company's rate of charge, or of doing them himself; such services being incidental to the ordinary services of a carrier and such as the customer without notice might have supposed was covered by the company's charges for tolls, and attention was called by the court that it was only after a controversy arose that a claim was made for this extra service.

As to the right to recover back the overcharges, see 25 W. Va. 434; S. C. 22 Am. & Eng. R. R. Cas. 469.

*Johns McCleave,* for defendant in error.—When a charge, in excess of a charter rate, is voluntarily paid by the shipper, with knowledge or means of knowledge of the excess, and without any coercion, or duress of goods, it comes within the ordinary rule as to voluntary payments and cannot be recovered. Thomas v. Philadelphia R. R. Co. 1 W. N. C. 621; Lehigh Coal & Nav. Co. v. Brown, 100 Pa. 338; Potomac Coal Co. v. Cumberland & P. R. Co. 38 Md. 226; Kenneth v. South Carolina R. Co. 15 Rich. L. 284, 18 Am. Dec. 382; Killmer v. New York C. & H. R. R. Co. 100 N. Y. 395, 53 Am. Rep. 194, 3 N. E. 293;

McGregor v. Erie R. Co. 35 N. J. L. 89; Arnold v. Georgia R. & Bkg. Co. 50 Ga. 304; Evershed v. London & N. W. R. Co. L. R. 2 Q. B. Div. 254; Hutchinson, Carr. § 447; 2 Rorer, Railroads, pp. 1371–2; Union Ins. Co. v. Allegheny, 101 Pa. 250; Espy v. Allison, 9 Watts, 462; Real Estate Sav. Inst. v. Linder, 74 Pa. 373; Milnes v. Duncan, 6 Barn. & C. 671; Bray v. Philadelphia, 11 W. N. C. 202.

Per Curiam:

The judgment in this case is affirmed, on the report of the referee.

Judgment affirmed.